**REPRISE CAPITAL CORPORATION,**
**Plaintiff–Appellant,**

v.

**ROGERS GROUP, INC.,**
**Defendant–Appellee.**

Court of Appeals of Tennessee,
Middle Section.

June 6, 1990.

Permission to Appeal Denied by
Supreme Court Oct. 1, 1990.

J. William Lincoln, III, Nashville, for plaintiff-appellant.

W. Lee Corbett, Nashville, for defendant-appellee.

OPINION

TODD, Presiding Judge.

This is a suit by the plaintiff, Reprise Capital Corporation, to recover $57,614.28 from the defendant, Rogers Group, Inc. Both parties moved for summary judgment. The Trial Judge overruled plaintiff's motion, sustained defendant's motion and dismissed plaintiff's suit. Plaintiff has appealed.

An understanding of the issues requires a brief summary of the events leading to the present controversy.

Plaintiff is a lending institution which held a lien upon all of the assets of Pidgeon–Thomas Iron Company which had contracted to furnish steel girders to defendant. On October 29, 1987, defendant received word that one of the girders was ready for delivery and sent Pidgeon a check for $57,628.59, the agreed price of the girder, to induce Pidgeon to deliver.

On October 30, 1987, Pidgeon notified defendant that the girder could not be delivered because plaintiff had taken possession of the assets of Pidgeon, including the girder, pursuant to its lien rights.

On a date not shown in the record, Pidgeon endorsed the check to the U.S. Internal Revenue Service to be credited upon tax liability of Pidgeon.

On November 2, 1987, defendant notified its bank to stop payment on the check.

On or about November 18, 1987, defendant's bank honored and paid the check.

On December 3, 1987, defendant filed suit in Chancery Court at Memphis, Tennessee, against plaintiff to obtain the delivery of the girder in question, as well as other girders which Pidgeon had contracted to deliver.

On December 17, 1987, after persuading the Internal Revenue Service to refund the proceeds of the check, defendant's bank credited to defendant's account the amount of the check, thereby refunding the amount previously charged to defendant and thereby effectively, although belatedly, honoring the stop-payment request.

After negotiations between defendant and plaintiff regarding the Memphis Chancery suit, a settlement agreement was prepared and signed by plaintiff on December 18, 1989. On this date, plaintiff was aware that the check had been received by Pidgeon, endorsed to and cashed by Internal Revenue Service and honored by defendant's bank despite a stop order; but on this date, plaintiff was not aware that the amount of the check had been credited back to defendant's account.

The agreement concludes:

Entered this ____ day of December, 1987.

However, the acknowledgement of the signature of the vice president of defendant is dated January 21, 1988.

The record contains a copy of a "Consent Order of Dismissal with Prejudice" which concludes:

So ordered, this ____ day of January, 1988.

/s/ Allisandrotos
Chancellor
25 Jan. 88

The order bears a faint stamp of filing, but its date is illegible.

Pursuant to the agreement, the girder in question was delivered to defendant without further payment.

On June 28, 1988, this suit was begun in Davidson County Chancery Court by a "Complaint for Relief From Judgment" which alleged the foregoing facts and prayed:

Wherefore Plaintiff prays that the Defendant be duly served with copies of this Complaint and cited to appear and answer hereto; that after proceedings are had there be Judgment rendered correcting and reforming the compromise agreement and decree of the Chancery Court to the end that this Plaintiff be awarded the sum of Fifty Seven Thousand Six Hundred Fourteen and 28/100 ($57,614.28) Dollars, and for needful orders in full, general and equitable relief.

Although the issue was not raised in the Trial Court or in briefs to this Court, and although the disposition of this appeal will be on other grounds, it should be noted that primary jurisdiction to grant relief from a judgment under T.R.C.P. Rule 60.02 appears to rest in the court which rendered the judgment. No Tennessee authority is found to this effect; but, in *Indian Head Ntl. Bank v. Burnelle*, First Circuit, 1982, 689 F.2d 245, it was held that an action under Federal Rule 60(b)(1, 6) should have been brought in the Court where the judgment was rendered. The same rule (T.R.C.P. Rule 60.02) limits independent actions for relief to cases of "fraud upon the court" which does not appear from the evidence in this record. In *Trice v. Moyers*, Tenn.1978, 561 S.W.2d 153, the Supreme Court remanded a Rule 60.02 action for further hearing and said:

There is no question in this state of the authority of a court of equity to order a new trial, either in the law courts or in an equity court itself, when a party has, without fault on his part, been deprived of effective appellate review. See, *F.D.C. Corp. v. Burgess*, 225 Tenn. 546, 473 S.W.2d 186 (1971). The filing of a separate or independent suit in equity for relief from a judgment is recognized as a permissible remedy under Rule 60.02. This, however, has not been encouraged, since the adoption of the Rules of Civil Procedure. Most claims for relief from a judgment which has become final can be presented under the provisions of Rule 60. See *Jerkins v. McKinney*, 533 S.W.2d 275 (Tenn.1976).

561 S.W.2d at 155–156.

■ As previously stated, this appeal is from a summary judgment dismissing plaintiff's suit.

Appellant presents the following issues:

1. Did the Court err in holding that the Settlement and Release Agreement was binding?

2. Whether or not the compromise of a legal action is subject to impeachment if procured by fraud or false representation?

3. Whether or not Appellee had a duty to disclose to Appellant when the compromise and settlement was negotiated, that Appellee had no intention of paying the funds to the Appellant if recovered from the Bank?

Appellant first insists:

At the time the settlement was being negotiated and finally executed, Appellee had already received back the funds represented by the $57,614.28 check it had sent to Pidgeon for the steel represented by Invoice 12. Although the check was endorsed over to the IRS by Pidgeon's president and paid to the IRS over Appellee's stop payment order, the affidavit of bank employee, Robert Porter (R. pp. 72–74), establishes that the funds were returned by the IRS and that Appellee's account with the Bank was recredited the full $57,614.28 on December 17, 1987.

The fact that, prior to the consummation of the settlement, the amount of the check had been refunded to defendant is not dispositive of this controversy. The reason for this is that the rights of plaintiff do not rest upon the refund made by the bank to defendant, but whether defendant has been unjustly enriched at the expense of defendant.

The rights, if any, of plaintiff are derivative of the rights of its debtor, Pidgeon–Thomas. That is to say, if Pidgeon–Thomas received payment for the girder in question, then plaintiff has no right of recovery, whether for fraud, concealment, misrepresentation, unjust enrichment, or otherwise. On the other hand, if Pidgeon–Thomas received no benefit from the check because it was dishonored, then, by the delivery of the girder without benefit of payment therefor, either Pidgeon–Thomas or its lienholder, plaintiff, has sustained a loss for which compensation could be recovered upon proof of a recognized right of action.

In this connection, the evidence in this record leaves considerable doubt as to the status of the title to the girder, ergo the relative rights of possession by Pidgeon, Reprise and defendant. There is no explicit evidence as to the agreement of defendant and Pidgeon reflecting when title to the girder would pass to defendant. See T.C.A. § 47–2–401.

To entitle a party to recover damages for fraud, he must not only establish the fraud, but also some injury or loss to him as a result of the fraud. *Whitson v. Gray*, 40 Tenn. (3 Head) 441 (1859); *Fiddler's Inn, Inc. v. Andrews Distributing Co., Inc.*, Tenn.App.1980, 612 S.W.2d 166; *Croft v. Gentry*, 33 Tenn.App. 595, 232 S.W.2d 424 (1950).

Actions brought upon theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same, and are a class of implied obligations where, on basis of justice and equity, the law will impose contractual obligations upon the parties regardless of their assent thereto. *Paschall's, Inc. v. Dozier*, 219 Tenn. 45, 407 S.W.2d 150 (1966).

■ The most significant requirement for recovery on quasi contract is that enrichment to defendant must be unjust. *Peters v. Michael Construction Co., Inc.*, Tenn.App.1984, 688 S.W.2d 81.

■ The doctrine of unjust enrichment is founded upon the principle that someone receiving a benefit desired by him, under circumstances rendering it inequitable to retain it without making compensation, must do so (make compensation). *Lawler v. Zapletal*, Tenn.App.1984, 679 S.W.2d 950.

It is not the enrichment of the defendan but the *unjust* enrichment of the defendant at the expense of the plaintiff, which is required for recovery on this theory.

If Pidgeon–Thomas obtained credit against its taxes in exchange for defendant's check, and if the Internal Revenue Service has not recharged Pidgeon–Thomas with the same amount because of the return of the check, then Pidgeon–Thomas has received the permanent benefit of the check, the girder has been paid for, defendant was entitled to its girder, plaintiff may have obtained no rights in it by sei-

zure and may not have been damaged as a result of the enrichment of defendant.

If, under the agreement between defendant and Pidgeon–Thomas, title to the girder had not passed at the time of seizure, then plaintiff may have sustained a loss by the shipment of the girder, and may have standing to assert a claim for unjust enrichment. However, this record does not establish that plaintiff has sustained a loss. At most, it shows that plaintiff may have sustained a loss of part of its security for its claim against Pidgeon–Thomas, but there is no showing that plaintiff lost any part of its claim.

On the other hand, if, as a result of the refund of the amount of the check and its belated dishonor, the Internal Revenue Service has cancelled the credit for the $57,-614.28 check and recharged Pidgeon–Thomas this amount, then Pidgeon–Thomas has not received any permanent benefit from the check, the girder has not been paid for, and either Pidgeon–Thomas or plaintiff is entitled to be paid for it, according to which sustained the loss.

Unfortunately the evidence in this record does not answer the questions of fact just posed.

The affidavit of Cecil Cook, an employee of defendant, states that, on December 18, 1987, he knew that defendant intended to demand reimbursement from the bank for the disregard of the stop payment order; but that, on that date, he was not aware that the bank had recredited the amount of the check to defendant's account.

The affidavit of Andrew Byrne, attorney for defendant, states that, on December 18, 1987, "the date on which the parties agreed to settle the case", affiant knew that the bank had paid the check to Internal Revenue Service in violation of the stop order and that plaintiff was advised that defendant intended to pursue its remedies against the bank. The affidavit also states that, on January 20, 1988, affiant advised plaintiff that the amount of the check had been recredited to defendant's account.

It thus appears that, on January 21, 1988, when the vice president of defendant signed the settlement, and, on January 25, 1988, when the settlement was approved by the court, defendant did know that the amount of the check had been credited to defendant's bank account. There is evidence that prior to the final execution of the settlement agreement on January 21, 1988, plaintiff was informed of the refund to defendant and could have rescinded its adherence to the settlement agreement before it was accepted by defendant.

There is evidence that, on January 12, 1988, counsel for plaintiff wrote a letter to counsel for defendant stating:

> ... An IRS agent told me that the check from the Rogers Group, Inc., dated October 29, 1986, in the amount of $57,-614.28, payable to Pidgeon–Thomas Iron Company did not clear....

This letter is not competent evidence of the fact stated in the quoted part, above, and the stated fact is not conclusive that the credit on the taxes of Pidgeon–Thomas has been cancelled.

The affidavit of Robert Porter, an employee of defendant's bank states:

> That on or about December 16, 1987 the Bank's customer, Rogers Group, Inc., requested the Bank to reimburse the account of Rogers Group, Inc. for the funds paid over the stop payment order.

> On receiving this request, the Bank's representatives contacted the Internal Revenue Service and requested approval to charge back the item paid and return the funds to the Bank. The Internal Revenue Service agreed to do so. The Bank then contacted the Federal Reserve Bank and the required entries were made to the Federal Reserve Accounts and in the Bank's records to adjust such records for the stop payment return.

> The Rogers Group, Inc. account was credited for the debit of Fifty–Seven Thousand Six Hundred Fourteen and 28/100 ($57,614.28) on December 17, 1987.

The foregoing appears to be all of the evidence reflecting upon the issue of whether the check of $57,614.28 produced a permanent benefit to Pidgeon–Thomas in the form of a credit on taxes, or whether

the credit was withdrawn upon ultimate dishonor of the check.

Moreover, there is an unanswered question of whether the Internal Revenue Service had the duty or right to waive its legal claim to proceeds of the check and to recharge Pidgeon–Thomas with the tax after the check had been dishonored.

There is also a question of whether such an issue could or should be resolved in a case to which Pidgeon–Thomas, or its representative is not a party.

This Court concludes that the evidence in this record does not support a summary judgment for the plaintiff because it does not show conclusively that plaintiff has suffered a compensable loss for which it has a right to recover from defendant.

This ground of disposition does not conform to the theories presented by the parties in their briefs on appeal.

Plaintiff takes the position that, since the check was ultimately dishonored, the defendant was guilty of fraud or was unjustly enriched by obtaining the girder without paying for it.

Defendant responds that, when the agreement was "made" (about December 18, 1987) neither party knew the facts and each accepted the peril of future developments.

The record does not support a case of present fraud on December 18, 1987, but it does support a duty upon defendant to disclose what it knew (the refund) on January 21, 1988, at or before the time the settlement agreement was completed by affixing defendant's signature to the written agreement.

It would be possible for defendant to retain the benefit of the $57,614.28 refund without liability to Pidgeon–Thomas or plaintiff if the refund was accomplished at the expense of the bank or Internal Revenue Service without loss to plaintiff or Pidgeon–Thomas. This is not conclusively shown by the record.

On the other hand, if the refund to defendant resulted in a compensable loss to plaintiff, then plaintiff may be entitled to recover damages in a proper action in a proper court upon proof of fraud, mistake of the parties, unjust enrichment or other equitable theory.

The summary judgment for defendant is reversed and vacated. The costs of this appeal are taxed against defendant. The cause is remanded for further proceedings.

Reversed and remanded.

LEWIS and KOCH, JJ., concur.